# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

MICHELLE LYN CHEEK,

                                        Plaintiff,

            v.                                          5:14-CV-482
                                                        (TJM/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

HOWARD D. OLINSKY, ESQ., for Plaintiff
VERNON NORWOOD, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable

Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b)

and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

On, September 29, 2009,[1] plaintiff protectively filed an application for Child's

Disability Insurance Benefits ("DIB"), and an application for Supplemental Security

Income ("SSI"), alleging disability beginning September 26, 2008. (Administrative

Transcript ("T") at 10, 267-68, 292). The application was denied initially on April 23,

2010. (T. 157). Plaintiff requested a hearing before an Administrative Law Judge

("ALJ") which was held on February 17, 2011. (T. 47-74). On May 24, 2011, ALJ

---

[1] On September 16, 2008, plaintiff filed a prior application for child's insurance benefits and SSI. (T. 105-106). The claims were denied initially at the State agency level, but plaintiff did not appeal, and the Commissioner's decision is binding. 20 C.F.R. §§ 404.905, 416.1405.

Thomas Tielens found plaintiff was not disabled. (T. 125-33). On December 9, 2011, the Appeals Council remanded the case for further proceedings. (T. 122-43).

Plaintiff's second hearing was held before ALJ John P. Ramos[2] on August 2, 2012. (T. 77-104). On September 12, 2012, Judge Ramos denied plaintiff's application. (T. 10-20). The ALJ Ramos's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on February 27, 2014. (T. 1–4).

## II.   GENERALLY APPLICABLE LAW[3]

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or

---

[2] ALJ Tielens retired from the agency. (T. 78).

[3] A claimant is entitled to Child's Benefits on the earnings record of an insured individual who is entitled to old age or disability benefits or who has died if the claimant is at least eighteen years old and has a disability which began before she turned twenty-two. 20 C.F.R. § 404.350(a). In this case, plaintiff was eligible to apply for "Child's Benefits," however, her impairments were appropriately analyzed under the adult standard.

whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

**B.    Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin,*

*Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  FACTS

Defendant has incorporated the plaintiff's statement of facts, "with the exception of any inferences, suggestions, or arguments contained therein." (Def.'s Br. at 2) (citing Pl.'s Br. at 2-9). Defendant also supplemented the fact statement with a summary of the relevant medical evidence. (*Id.* at 3-9).  The court will adopt the facts as stated by the parties.  The court will briefly summarize the plaintiff's testimony.  However, further details regarding the medical and other evidence, including the medical opinion evidence, are discussed below as necessary to address the issues raised by plaintiff.

Plaintiff alleges that she is disabled due to a learning disability, back pain, ADHD, asthma, and depression. (T. 10, 267, 292). Plaintiff was twenty-one years old at the time of her second hearing. (T. 77).  She was 5'5" or 5'6" tall and weighed between 250 and 260 pounds. (T. 79).  She lived with her mother in a single-family home, and at the time of the hearing, she was working on earning her general equivalency degree ("GED") with a "home study" program. (T. 80).  Plaintiff testified that she spent approximately two hours per day studying. (T. 81).  Plaintiff testified that she had a learner's permit, but had not taken her driving test because she got nervous when she drove. (T. 81).  She did not take public transportation because she was afraid to take the bus alone, and she had her father drive her "around town." (*Id.*)

Plaintiff testified that at the time of the hearing she had been working for approximately one month at a "Stride-Rite" store at the Carousel Mall, sizing children's feet and helping them pick out shoes. (T. 81-82).  She testified that the most she had to lift was "a regular shoe box," and that she spent most of her shift on her feet. (T. 83).

However, she was able to sit down for breaks. (T. 83). She also climbed a ladder to get shoes, and used the cash register. (T. 82-83).

The ALJ asked whether any of plaintiff's conditions gave her "any problems" at work. (T. 83). Plaintiff testified that her back bothered her when she bent over to size a child's feet or when she had to climb the ladder. (T. 83). In addition, plaintiff stated that "recently" she suffered from vertigo when she bent over. (*Id.*) Plaintiff stated that this happened once when she was on the ladder and she "kind of blacked out," but that she "caught" herself before she fell, and the manager let her go home. She stated that she went to the doctor's the next day and was told that she had vertigo. (T. 84). However, later, plaintiff testified that the vertigo was "curable," and that she was taking medication for it. (T. 100).

Plaintiff stated that she was currently working twenty hours per week, but had recently been told that her hours were going to be cut because "corporate told [the manager] that he was giving too many hours away." (T. 82, 99). Plaintiff testified that she never worked forty hours at the "Stride-Rite" job. (*Id.*) She also testified that she did not think that she would be able to work a forty-hour week at that job because climbing the ladder and bending would put a lot of stress on her back. (T. 99).

Plaintiff testified that she tried working at housekeeping jobs, but had to stop the first job because she "had no ride," and because her back bothered her when she was making the bed, lifting mattresses, and getting on her hands and knees to clean floors. (T. 84). She attempted working at a second housekeeping job for one week, but her physician advised her to stop. (T. 85). Plaintiff was not sure whether either of the

6

housekeeping jobs was full-time. (*Id.*)

Plaintiff stated that her back hurt all the time, and that some days were good, but some days, she could not even get out of bed. (T. 86). She testified that she had bad days approximately five days per week, but that when it got "that bad," she took ibuprofen and Flexeril for the back pain. (*Id.*) Plaintiff testified that she had asthma, but was not having as many problems with it. (T. 86). She stated that her asthma only bothered her if she ran or walked up stairs or hills "fast." (*Id.*) Plaintiff stated that she got headaches, which were often caused by the scents in candles, perfume, the light from the television, or the sun. (T. 87). Plaintiff took ibuprofen for the headaches. (*Id.*)

Plaintiff testified that she thought her depression was getting worse. (T. 88). She stated that she would sit in her room and cry for hours "maybe twice a week," and that sometimes she would stay in her room all day. (*Id.*) However, when this happened on days that she was scheduled to work, she would "make [herself] get up and go to work." (*Id.*) Plaintiff testified that the depression limited her because she did not want to "deal" with anyone, and that her anxiety prevented her from going places by herself, particularly in big crowds. (T. 89). Plaintiff testified that she would start to "shake and panic" at the sight of a big crowd, particularly if the individuals in the crowd were men. (*Id.*) Plaintiff stated that the ADHD or learning disability affected her job because she got "nervous" and thought too much. As a result, she would make errors in counting change or "saying the total." Although she stated that this happened "[a]lmost all the time," she also stated that she never got into trouble at work for these errors. (*Id.*)

Plaintiff testified that her average day was spent watching television and doing

homework. (T. 90).  She used to play basketball, "hang out" with friends, walk, and ride bicycles, but she stopped engaging in those activities because she was "really depressed," and did not feel like doing them. (*Id.*)  She did her own laundry, but her mother did the rest of the housework, cooking, shopping, and gardening. (T. 91).  Plaintiff tried to mow the lawn and help plant flowers, but these activities hurt her back.  She stated that she could sit for only ten minutes before she had to get up and move around, and that she could only stand for ten to fifteen minutes before she had to move or sit down. (*Id.*)  She could walk approximately one and one half blocks before she had to stop and rest. (T. 92).  She stated that if she took Flexeril for the pain, it put her to sleep. (T. 90).

Plaintiff testified that her doctor told her not to lift more than ten pounds, but she thought that she could lift approximately twenty to twenty five pounds.  She then stated: "but I don't because I don't want to hurt my back." (*Id.*)  Plaintiff stated that she had trouble pushing or pulling a heavy grocery cart, but that she did not have trouble pushing the ladder at work because it was "not too heavy," and it was "on wheels." (T. 92-93).  She had no trouble grasping and holding onto things. (T. 93).  Plaintiff had trouble bending because it hurt her back, and she would lose her balance. (*Id.*).  She estimated that she could climb one or two flights of stairs before she had to stop and rest. (*Id.*)

Plaintiff testified that her concentration was affected by her pain.  If she sat down to do her homework, and her back began to hurt, she could not concentrate at all. (*Id.*)  However, she could not think of anything else that affected her ability to concentrate.

(*Id.*)  Plaintiff stated that she did not have trouble sleeping "too often." (T. 94).  If she did have trouble sleeping, it was due to back pain.  "[O]"ther than that, [she had] no [] problems," and if her back bothered her, she took a Flexeril so she could sleep. (*Id.*)

The ALJ asked plaintiff whether she had panic attacks, and plaintiff stated that she did not know exactly how "they" feel, but that she described her "pain" or her "feelings" to a friend, and her friend told her "that's what it sounded like." (T. 95).  Plaintiff testified that these feelings occurred when she went out in public by herself.  She would start to breathe heavily, shake, and sweat. (*Id.*)  Plaintiff also stated that this reaction occurred when she was walking past big crowds. (*Id.*)

Plaintiff testified that at the time of the 2012 hearing, she did not have a "regular doctor," and that she was "in the process of finding one." (T. 85).  Plaintiff stated that although she used to see Dr. Dunbar, she had not seen her since August of 2011, when plaintiff turned twenty-one years old because Dr. Dunbar was a pediatrician. (T. 97).  Plaintiff testified that when she saw Dr. Dunbar in 2011, plaintiff was attempting to work as a housekeeper, and plaintiff's back was bothering her.  Plaintiff testified that she was working at a hotel, and Dr. Dunbar "took [her] out and said that she didn't want me to lift more than 10 pounds . . . ."  Dr. Dunbar believed that "a hotel job" would not be appropriate for plaintiff's back problems. (*Id.*)

Dr. Dunbar referred plaintiff to physical therapy, but she testified that she could not find "rides," and then the "doctor" she was seeing went on maternity leave. (T. 98).  Therefore, plaintiff only attended three physical therapy sessions. (*Id.*)  The ALJ asked plaintiff how she obtained "spending money," and plaintiff stated that sometimes her

cousin would let her watch her son and pay her for babysitting. (T. 100).

## IV.   THE ALJ'S DECISION

After discussing the Appeal's Council's remand order, the ALJ found that plaintiff had not engaged in substantial gainful activity ("SGA") since her onset date of September 1, 2008. (T. 13). Even though plaintiff was working twenty hours per week at a shoe store, she testified that she never worked completed a forty-hour week, and her earnings fell below the level of SGA as set forth in the regulations. (T. 13). At step two of the disability analysis, the ALJ determined that plaintiff's chronic back pain,[4] asthma, learning disorder, impulse control disorder, and personality disorder were "severe." (*Id.*)

In making the severity determination, the ALJ also considered plaintiff's obesity as directed by the Appeals Council in its remand order. (T. 12, 13). The ALJ found that no specific level of weight or body mass index ("BMI") equates with a severe or not severe impairment. (T. 14) (citing Social Security Ruling ("SSR") 02-01-p). The descriptive terms (severe, extreme, or morbid) for levels of obesity likewise fail to establish whether the obesity is "severe" for program purposes. (T. 14). The ALJ found that plaintiff had a normal gait, was able to fully squat, had a normal station, could heel/toe walk, and was able to rise from a chair without difficulty. Plaintiff did not allege obesity as an impairment on her adult disability report. The ALJ found that because there was no evidence of "any functional limitations" based on obesity, it was

---

[4] The ALJ noted that even though all diagnostic imaging of plaintiff's back had been negative and plaintiff's course of treatment has been conservative, he was going to give plaintiff "the benefit of the doubt" and consider her chronic back pain a severe impairment. (T. 13).

not a severe impairment.[5] (T. 14).

At step three of the sequential analysis, the ALJ found that plaintiff does not have an impairment or combination of impairments that meets or medically equals a Listed Impairment. (T. 14). At step four, the ALJ found that plaintiff has the RFC to perform light work as defined in the regulations, except that she should avoid concentrated exposure to dust, fumes, and other pulmonary irritants. (T. 16). The ALJ also found that plaintiff has the ability to understand and follow simple instructions and directions; perform simple tasks with supervision and independently; maintain attention/concentration for simple tasks, regularly attend to a routine and maintain a schedule; and relate to and interact appropriately with others to the extent necessary to carry out simple tasks. She can also handle reasonable levels of simple repetitive work-related stress, in that she can make decisions that are directly related to the performance of simple tasks in a position with consistent job duties, that does not require the plaintiff to supervise or manage the work of others. (*Id.*)

The ALJ stated that he considered all plaintiff's symptoms, including her pain, in accordance with the appropriate regulations. (T. 17). The ALJ stated that his RFC determination was based upon the opinions of psychologists Kristen Barry and Dennis Noia, together with medical consultant, E. Kamin. (*Id.*) The ALJ stated that each of these providers found that plaintiff could engage in unskilled work because she was able to follow and understand simple directions and instructions; perform some simple tasks independently and learn new tasks; was able to maintain attention and

---

[5] Plaintiff does not challenge this finding.

concentration for tasks; and could regularly attend to a routine and maintain a schedule. She could make appropriate simple decisions, and she could relate to and interact "moderately well" with others. (*Id.*) Plaintiff's ability to perform unskilled work was consistent with her ability to take classes for her GED, work part-time, and successfully complete her activities of daily living ("ADLs").

The ALJ also found that plaintiff's medically determinable impairments could be reasonably be expected to cause the alleged symptoms, but that the plaintiff's statements about the intensity, persistence, and limiting effects of those symptoms were not fully credible to the extent that they were inconsistent with the ALJ's RFC evaluation. The ALJ found that plaintiff's impairments could cause pain. The ALJ also stated that a "finding of limited credibility" meant that plaintiff had "failed to produce appropriate probative evidence . . . to substantiate her allegations of disabling symptoms," as required by the Social Security Act. (*Id.*)

The ALJ considered plaintiff's back pain, noting that plaintiff made "significant" allegations regarding her exertional limitations. The ALJ reviewed the medical evidence which included many normal clinical findings and conservative treatments. (T. 18). The ALJ stated that plaintiff was referred for physical therapy, but was discharged for non-attendance. With respect to her asthma, her pulmonary function tests were normal. The ALJ noted plaintiff's ability to work part-time and to manage the physical aspects of the job. The fact that she is able to work and has indicated a desire to work more, is "not consistent with disabling allegations." This applies to her physical and her emotional impairments. The ALJ noted that plaintiff testified to

having crying spells, but there was nothing in the record to substantiate that statement. (*Id.*)

The ALJ afforded significant weight to the consultative opinions of Kalyani Ganesh, M.D. and George Sirotenko, D.O. (*Id.*) Dr. Ganesh found that plaintiff had no exertional limitations, based on the negative clinical findings and a physical examination of the plaintiff. (*Id.*) Dr. Sirotenko found "mild limitations" in plaintiff's lumbar spine and stated that she should avoid overhead lifting and avoid respiratory triggers because of her asthma. (*Id.*) Dr. Sirotenko's determination was based upon his finding of paralumbar tenderness and slightly limited range of motion, but 5/5 strength in her upper and lower extremities, no muscle atrophy, no motor or sensory defects, and normal pulmonary function test results. (*Id.*)

The ALJ gave Dr. Dunbar, plaintiff's treating pediatrician, little weight. Although Dr. Dunbar made a conclusory statement that plaintiff could only lift ten pounds, she offered no support for this conclusion. The ALJ noted that plaintiff's treatment has been limited to "over the counter pain medication and physical therapy." (*Id.*) With respect to her mental status, the ALJ gave the opinions of Dr. Barry and Dr. Noia significant weight because they both had the opportunity to examine plaintiff and perform intelligence testing. (T. 19). The ALJ also gave State Agency Psychologist Dr. Kamin's opinion significant weight. Dr. Kamin, a non-examining pscychologist, found that plaintiff retained the ability to perform simple work with little personal interactions; carry out simple instructions; maintain adequate concentration, persistence, and pace; interact appropriately; and make simple decisions. The ALJ

found that Dr. Kamin's opinion was consistent with plaintiff's own testimony and reports of socializing, taking classes, working part-time, and maintaining her ADLs. (T. 19).

The ALJ then considered the effect of plaintiff's obesity and noted that every examiner who offered an opinion had either seen plaintiff in-person, made note of her weight, or commented on her obesity. (*Id.*) The ALJ found that absent any "qualifying statement," those opinions "necessarily" took plaintiff's weight into account. The ALJ stated that he was not in a position to assess any further limitations based upon plaintiff's weight that had not been considered by the medical professionals. (*Id.*) The ALJ concluded by applying the Medical Vocational Guidelines[6] ("the Grids") as a framework to find that plaintiff was not disabled, after determining that plaintiff's non-exertional impairments did not significantly erode the occupational base of light work and finding that a vocational expert ("VE") was not necessary. (T. 20).

V.   **ISSUES IN CONTENTION**

Plaintiff raises the following arguments:

1.    The ALJ's RFC assessment is not supported by substantial evidence due to the ALJ's failure to properly evaluate the medical opinions and evidence. (Pl.'s Br. at 11-16) (Dkt. No. 10).

2     The ALJ's credibility finding is not supported by substantial evidence. (Pl.'s Br. at 17-18).

3.    The ALJ's step five determination is not supported by substantial evidence, and the ALJ should have obtained the testimony of a VE. (Pl.'s Br. at 18-20).

---

[6] 20 C.F.R. Pt. 404, Subpt. P, App.2 § 202.17.

14

Defendant argues that the Commissioner's determination is supported by substantial evidence and should be affirmed. (Def.'s Br.) (Dkt. No. 11). For the following reasons, this court agrees with the defendant and will recommend dismissing the complaint.

## DISCUSSION

## VI. RFC EVALUATION/TREATING PHYSICIAN

### A. Legal Standards

#### 1. RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v.*

*Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

### 2. Treating Physician

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is *not* required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must properly analyze the reasons that the report of a treating physician is rejected. *Id.* An ALJ may not arbitrarily substitute his/her own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

Notwithstanding the "treating physician rule," it is the province of the ALJ to consider and resolve conflicts in the evidence as long as the decision rests upon "adequate findings supported by evidence having rational probative force." *Galiotti v. Astrue*, 266 F. App'x 66, 67 (2d Cir. 2008) (citing *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002)). A conclusory statement of disability is not binding on the ALJ if that opinion is inconsistent with substantial evidence in the record. *Michels v. Astrue*,

297 F. App'x 74, 76 (2d Cir. 2008) (citing *inter alia Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *Veino*, 312 F.3d at 588. *See* 20 C.F.R. § 404.1527(e)(1) (a statement by a medical source that a claimant is "disabled" does not mean that the Commissioner will make that determination). The term "disabled" is a legal, not a medical definition. *Id.*

## B. Application

Plaintiff argues that the ALJ failed to properly assess Dr. Dunbar's opinion that plaintiff could only lift ten pounds which is inconsistent with the ability to perform light work.[7] Plaintiff claims that if the ALJ was not going to give the treating physician "controlling weight," and the opinion was "unclear," the ALJ had a "duty" to recontact the treating physician and seek "additional evidence or clarification." (Pl.'s Br. at 12-13) (citing *Ellett v. Comm'r of Soc. Sec.*, No. 1:06-CV-1079, 2011 WL 1204921, at *7, 2011 U.S. Dist. LEXIS 32660, at *19 (N.D.N.Y. Mar. 29, 2011)).

The court would first point out that Dr. Dunbar's "opinion" regarding plaintiff's ability to lift consists of a handwritten note, dated February 11, 2011, on a prescription pad, stating that "Michelle has back pain secondary to an assault at Target. She is unable to lift more than 10#." (T. 480). Dr. Dunbar was plaintiff's treating pediatrician. Dr. Dunbar has other progress notes in the record, beginning as early as 2007. (*See e.g.* T. 423). On November 19, 2010, Dr. Dunbar stated that plaintiff had back pain for two years after the assault at Target, but noted that the x-rays of plaintiff's back were

---

[7] Light work requires, inter alia, that plaintiff be able to lift up to twenty pounds at one time, with frequent lifting or carrying of objects weighing up to ten pounds. 20 C.F.R. § 416.967(b).

17

negative. (T. 424). On August 18, 2011, Dr. Dunbar stated that plaintiff has had back pain for three years, has done "PT" and "had to quit work as cashier since [she] couldn't lift."[8] (T. 536). Dr. Dunbar noted that plaintiff was working as a housekeeper "which is prob[ably] worse." (*Id.*) Dr. Dunbar's stated that plaintiff had a "somewhat stiff back" without any radiation of pain. Her assessment was "chronic back pain." She stated that plaintiff had not had an MRI yet, but plaintiff wanted to be referred for an orthopedic consultation. (*Id.*)

The ALJ correctly noted that there was no clinical basis for Dr. Dunbar's assessment of plaintiff's ability to lift. The court notes that Dr. Dunbar's progress notes do not contain any indication that Dr. Dunbar did any actual physical testing of plaintiff's back. In fact, plaintiff herself testified that although Dr. Dunbar told her to only lift ten pounds, plaintiff thought she could lift twenty to twenty five pounds. (T. 92). The ALJ gave significant weight to the opinions of Dr. Ganesh and Dr. Sirotenko. In January of 2009, Dr. Ganesh stated that plaintiff had no exertional limitations based upon the negative clinical findings, and in April of 2010, Dr. Sirotenko found mild limitations in plaintiff's lumbar spine. (T. 429). She should "avoid" lifting objects over her head to prevent axial load. (*Id.*)

On September 27, 2011, plaintiff was examined by Dr. Christopher Watts from Upstate Orthopedics. (T. 538-40). Dr. Watts stated that plaintiff was in no acute distress and walked with a normal balanced gait. (T. 539). She had tenderness in the

---

[8] Plaintiff's "work history" notes that she worked as a cashier at Target for two days from November 16, 2009 until November 18, 2009. (T. 327).

upper lumbar paravertebral area upon palpation, but no appreciable spasm. She had full range of motion of the back "without difficulty." She had "tenderness" with range of motion, but straight leg raising was negative bilaterally. (*Id.*) She had full strength in her lower extremities, sensation was grossly intact, and she had palpable pulses in the popliteal. Dr. Watts noted that she had "near normal anatomic alignment with slight asymmetry in her lumbar spine. There was slight retrolisthesis on L3-L4, but it appeared stable through flexion and extension views. There was a question of a "lucency" at L1 right transverse process" which appeared to be "maybe an old fracture" The radiologist agreed, but felt that it was "likely a congenital type abnormality and recommended further imaging with CT." (*Id.*) Dr. Watts suggested further imaging, including an MRI. (T. 540).

There is substantial evidence to contradict the treating physician's conclusory statement about plaintiff's ability to lift. Plaintiff testified that on August 6, 2012, she went to a new medical practice[9] to have a "work" physical because she was applying for a "companionship job." (T. 101). In addition to the consultative reports by Dr. Ganesh and Dr. Sirotenko, the 2012 physical examination noted that there was "no joint pain;" no anxiety; no depression; normal gait; normal movements of all extremities; no joint instability; her muscle strength and tone were normal; and her asthma was well controlled. (T. 534).

It is well-settled that, because a hearing on disability benefits is a nonadversarial

---

[9] This occurred in part because plaintiff could no longer see Dr. Dunbar, a pediatrician. Plaintiff testified at the hearing that she was looking for a new treating physician. (T. 96-97, 100-101).

proceeding, the ALJ has an affirmative duty to develop the record, whether or not a plaintiff is represented. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). Prior to March of 2012, the regulations provided that when the treating physician's report contained "a conflict or ambiguity" that must be resolved, the ALJ was required to "seek additional evidence or clarification" from that source in order to fill in any clear gaps before rejecting the doctor's opinion. *Rolon v. Commissioner of Soc. Sec.*, 994 F. Supp. 2d 496, 504-505 (S.D.N.Y. 2014) (citing inter alia *Correale Englehart v. Astrue*, 687 F. Supp. 2d 396, 428 (S.D.N.Y. 2010); 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1) (2010)). This duty arose if the physician's report was "insufficiently explained, lacking in support, or inconsistent with the physician's other reports." *Id.*

Effective March 26, 2012, the Commissioner amended 20 C.F.R. §§ 404.1512 (e)(1) and 416.912(e)(1) to remove former paragraph (e), together with the duty that it imposed on the ALJ to re-contact the treating physician under certain circumstances. *Lowry v. Astrue*, 474 F. App'x 801, 805 n.2 (2d Cir. 2012) (citing How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10,651, 10,656 (Feb. 23, 2012) (to be codified at 20 C.F.R. § 416.912) (deleting former paragraph (e) and redesignating former paragraph (f) as paragraph (e)). The court applies the section in effect when the ALJ adjudicated plaintiff's claim. *Id.* The ALJ's decision in this case is dated September 12, 2012, thus, the new section applies.

The new section allows the ALJ to choose the appropriate method for resolving insufficiencies or inconsistencies, which is designed to afford adjudicators "more flexibility." *Perrin v. Astrue*, No. 11-CV-5110, 2012 WL 4793543, at *3 n.3 (E.D.N.Y.

Oct. 9, 2012) (citing <u>How We Collect and Consider Evidence of Disability</u>, *supra*). The ALJ must attempt to resolve the inconsistency or insufficiency by taking one or more of the following approaches:

> (1) recontacting the treating physician or other medical source, (2) requesting additional existing records, (3) asking the claimant to undergo a consultative examination, or (4) asking the claimant or others for further information.

*Id*. (citing 20 C.F.R. §§ 404.1520b(c)(1)-(4), 416.920b(c)(1)-(4)).

Despite the duty to develop the record, remand is not required where the record contains sufficient evidence from which the ALJ can assess the plaintiff's residual functional capacity. *Covey v. Colvin*, No. 13-CV-6602, 2015 WL 1541864, at *13 (W.D.N.Y. Apr. 6, 2015) (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013)).  In this case, there were no "gaps in the record," requiring further development before the ALJ could reject Dr. Dunbar's conclusory statement about the amount of weight plaintiff could lift.  The plaintiff had already undergone consultative examinations which contradicted Dr. Dunbar's findings. The clinical evidence was all contradictory to Dr. Dunbar's opinion, and the report of a consultative examiner may serve as substantial evidence upon which the ALJ may base his decision. *Herb v. Colvin*, No. 14-CV-156, 2015 WL 2194513, at *5 (W.D.N.Y. May 6, 2015) (citing *Finney ex rel. B.R. v. Colvin*, No. 13-CV–543A, 2014 WL 3866452, at *7 (W.D.N.Y. Aug. 6, 2014) (Report-Recommendation)); *Simmons v. Comm'r of Soc. Sec.*, No. 13-CV-5504, 2015 WL 2182977, at *16 (S.D.N.Y. May 8, 2015) (citing *Mongeur v. Heckler*, 722 F.2d at 1039).

There is little indication of any specific impairment of plaintiff's back,[10] based upon either diagnostic imaging or physical examination of her functional capacity, including tests showing full range of motion and mild limitations. (T. 384, 429). The ALJ correctly stated that Dr. Dunbar's opinion "finds little support in the record." (T. 18). Additionally, by the time of the hearing, Dr. Dunbar was no longer plaintiff's treating physician as she was a pediatrician, and a medical report by PA Dawn Scott from February of 2012 shows that plaintiff had normal movements of all extremities, no joint instability, and normal muscle strength and tone.[11] (T. 533).

Both Dr. Ganesh and Dr. Sirotenko examined plaintiff and tested her ability to perform particular movements. (T. 385, 429). The ALJ did not doubt that plaintiff experiences some pain, however, the issue is the degree of pain and the extent that it limits her ability to work. Thus, the ALJ was not required to recontact Dr. Dunbar because there were no gaps in the record, and there was substantial evidence supporting the minimal weight that he gave her opinion regarding plaintiff's ability to lift only ten pounds.

Plaintiff claims that although the ALJ gave "significant weight" to Dr. Sirotenko's opinion, the ALJ did not include Dr. Sirotenko's statement that plaintiff should "avoid lifting objects over her head," while including the doctors statement that

---

[10] When plaintiff was referred to orthopedic specialist Dr. Watts, he found a "lucency" in plaintiff's lumbar spine, but opined that this could be an "old fracture" (T. 539). The radiologist confirmed that there was a lucency, but believed it was more like a "congenital" abnormality. (*Id.*) Plaintiff subsequently told PA Scott that plaintiff was told that it was "nothing serious." (T. 534).

[11] PA Scott was the individual who examined plaintiff for the "work" physical. (T. 534).

plaintiff should avoid respiratory triggers related to her asthma. (Pl.'s Br. at 16). The court notes that Dr. Sirotenko stated that plaintiff should "avoid" lifting objects overhead to prevent axial load. There is no other evidence of record that discusses any such limitation, plaintiff had full strength and full range of motion, and the ALJ was not required to accept such a restriction or include it in his RFC. The ALJ correctly included the pulmonary restrictions in the RFC because there is no question that plaintiff suffers from asthma, even though it is currently well-controlled and asymptomatic. Thus, the ALJ's inclusion of one restriction stated by Dr. Sirotenko, while leaving out another restriction was supported by substantial evidence.

Plaintiff also argues that the ALJ did not properly assess her mental limitations. Plaintiff states that the ALJ relied upon Dr. Barry, Dr. Noia, and Dr. Kamin, but in doing so, failed to include limitations that were stated by Dr. Kamin. (Pl.'s Br. at 14-16). Dr. Kamin, a non-examining psychologist, opined that plaintiff had "moderate" difficulty in various functional areas, including "moderate difficulty adapting to stressors." (T. 450, 451). Plaintiff argues that the ALJ did not include "limitations which correspond to these impairments in the RFC, but simply determined that plaintiff could perform "simple tasks." First, as stated above, the ALJ is not required to reconcile every shred of evidence in the record,[12] The ALJ cited to Dr. Kamin's report indicating that plaintiff had the ability for simple work with little personal interaction. The fact that she was "moderately" limited in various functions, including her ability to deal with stress, contributed to her ability to perform only simple work.

---

[12] *Mongeur, supra.*

Plaintiff argues that "simple work" does not "lessen the amount of social interaction required." (Pl.'s Br. at 15). The ALJ cited Dr. Kamin's findings that plaintiff could carry out simple instructions, maintain adequate concentration, persistence and pace, ***interact appropriately with the general public***,[13] and make simple decisions. (T. 450). The ALJ also stated that his determination was based "on the results of the consultative examinations, as well as claimant's statements regarding her [ADLs]." (T. 19). The ALJ's finding is consistent with plaintiff's reports of "socializing, taking classes, working part-time, and maintaining her activities of daily living." (*Id.*) Thus, the ALJ explained his reasoning for finding that plaintiff could perform simple work without addressing each and every limitation asserted by Dr. Kamin or specifically addressing "stress." The ALJ's determination is well-supported in the record.

In April of 2010, consulting psychologist Dr. Noia found that plaintiff was able to understand and follow simple instructions, maintain attention and concentration for tasks, regularly attend to a routine, learn new tasks and make appropriate decisions. (T. 461). Dr. Noia also stated that plaintiff appeared to be able to "relate to and interact moderately well with others." *Id.* Dr. Noia did note that plaintiff "appeared to be having some difficulty dealing with stress." (T. 462). The fact that an individual might have "some" difficulty dealing with stress would not preclude simple work. *See Covey v. Colvin*, 2015 WL 1541864, at *14-15 (Plaintiff argued that the ALJ improperly found that plaintiff could withstand the added stress of employment, because she experienced

---

[13] Dr. Kamin found that plaintiff had "no significant limitation" in this regard. (T. 450).

24

stress, anxiety, nightmares, flashbacks and auditory hallucinations; but the ALJ found that plaintiff could handle "reasonable levels of simple work-related stress. The ALJ used other evidence to determine that plaintiff could handle simple work).

In this case, at the time of the hearing, plaintiff was working part-time at a children's shoe store in a mall. The only problems that she noted related to her back, not to her anxiety, depression, or stress. Even though plaintiff stated that she often made mistakes making "change," she stated that she never got into trouble as a result, and she testified that she was able to use the cash register. The ALJ asked plaintiff what she would do if she were having about of depression, and plaintiff stated that she would make herself get up and go to work. Working in a mall shoe store clearly involves dealing with other people on a regular basis as well as handling a reasonable amount of stress. In 2012, when she asked PA Scott for a "work" physical, plaintiff was applying for a *companion* job. A companion position involves interacting with another individual. Plaintiff's activities and testimony support the ALJ's analysis of the medical evidence of record in finding that plaintiff's mental condition would not prevent her from performing simple work.

## VII.  CREDIBILITY

### A.    Legal Standards

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v.*

*Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to function. 20 C.F.R. § 416.929(c). When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. § 416.929(c)(3).

## B. Application

The ALJ found that plaintiff's statements "concerning the intensity, persistence and limiting effects of [her] symptoms are not fully credible to the extent that they are inconsistent with the above residual functional capacity assessment." (T. 17). Plaintiff argues that the ALJ did not specifically discuss the above factors. The ALJ's failure to specifically discuss the seven factors above does not require remand when the ALJ thoroughly discussed his credibility determination, and "the record evidence permits [the court] to glean the rational of the ALJ's decision." *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013). In *Cichocki*, as in this case, the ALJ found that plaintiff's medical impairments could cause the symptoms she alleged, but declined to credit the plaintiff's testimony "regarding the intensity persistence, and limiting effects of the symptoms to the extent that they were inconsistent with the medical evidence . . . ." (*Id.*)

In this case, the ALJ specifically stated that plaintiff made some "significant exertional allegations, particularly regarding her back," but that, among other things, she had nearly full range of motion of the lumbar spine, negative straight leg raising, no muscle atrophy, and full strength. (T. 18). The ALJ stated that after seeing an orthopedic specialist, plaintiff was advised only to take Ibuprofen.[14] (*Id.*) The ALJ did discuss the extent of plaintiff's daily activities and her ability to sustain work activity as one of the other reasons for finding her credibility lacking for both physical and mental

---

[14] The type, dosage, and side effects of medication is one of the factors in the credibility determination.

impairments.[15] (T. 18).  Thus, as in *Cichocki*, because the ALJ explained his credibility determination, and this court can determine the rationale of the ALJ's decision, his "failure to discuss those factors not relevant to his credibility determination does not require a remand." *See Cichocki*, 534 F. App'x at 76.

## VIII. <u>VOCATIONAL EXPERT</u>

### A. Legal Standards

Once the plaintiff shows that she cannot return to her previous work, the Commissioner bears the burden of establishing that the plaintiff retains the RFC to perform alternative substantial gainful work in the national economy. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).  In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Grids").  *Id.*  The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull.  20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996).  *See also* 20 C.F.R. §§ 404.1567 & 416.967.  Each exertional category of work has its own Grid, which then takes into account the plaintiff's age, education, and previous work experience.  *Id.*  Based on these factors, the Grids help the ALJ determine whether plaintiff can engage in any other substantial work that exists in the national economy.  *Id.*

---

[15] The ALJ specifically stated with respect to her "significant non-exertional allegations," there was nothing in the record to support her allegation of "crying spells," and "her ability to take classes, maintain [ADLs], and work part-time indicate that her symptoms are not as severe as alleged." (T. 18). Once again, this statement by the ALJ touches on one of the factors in the credibility analysis.

"Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted). When significant nonexertional impairments[16] are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *McConnell v. Astrue*, 6:03-CV-0521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

"If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert[,]" rather than relying solely on the Grids. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (*citing Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)). The mere existence of a nonexertional impairment does not automatically require consultation with a vocational expert, nor does it preclude reliance on the Guidelines. *Bapp v. Bowen*, 802 F.2d at 603. The requirement for a vocational expert is triggered when a nonexertional impairment causes an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id*. at 605-06. The appropriateness of applying the Grids and the necessity for expert testimony must be

---

[16] A "nonexertional" limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Mental impairments are clearly nonexertional.

determined on a case-by-base basis. *Id*. at 605.

## B.    Application

Plaintiff argues that the ALJ erred in failing to utilize the services of a VE because plaintiff had "significant non-exertional impairments." (Pl.'s Br. at 18-20). The ALJ specifically found that plaintiff had the physical ability to perform a full range of light work, and that the Grids would dictate a finding of not disabled. However, the ALJ then considered plaintiff's mental limitations and other non-exertional limitations. (T. 20). The ALJ stated that if the plaintiff could not perform all the exertional demands of work or had non-exertional limitations, the Grids are used as a "framework," unless there is a rule that directs a conclusion of disabled. (T. 20).

With respect to plaintiff's mental impairments, ALJ noted that the basic mental demands of competitive unskilled work include abilities that plaintiff possesses, and which were consistent with the ALJ's RFC determination: the ability to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. (T. 20) (citing SSR 85-15, 1985 WL 56857, at *4-5 (1985)). As stated above, this finding is supported by the psychological evidence. The ALJ found that the occupational base of light work was not significantly eroded, and the use of a VE was not required. The ALJ's findings are supported by substantial evidence, and the Commissioner's decision should be affirmed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and

plaintiff's complaint be **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: May 20, 2015

Hon. Andrew T. Baxter
U.S. Magistrate Judge